IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 1, 2022

## IN RE: JAIDON S. ET AL.

**Appeal from the Juvenile Court for Montgomery County**
**No. 2020-JV-276, 2020-JV-277, 2020-JV-278, 2020-JV-279 Tim Barnes, Judge**

_____

**No. M2021-00802-COA-R3-PT**

_____

Mother appeals the termination of her parental rights to her four children on grounds of abandonment by failure to support, persistence of conditions, and failure to demonstrate a willingness and ability to assume physical custody or financial responsibility. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Charity S.

Herbert H. Slatery, III, Attorney General and Reporter; Lexi A. Ward, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

This termination case involves Respondent/Appellant Charity S. ("Mother") and her four children, Jaidon, born in 2006; Zuri, born in 2010; Aviannah, born in 2017; and Serenity, born in 2018.[1] In July 2018, Mother tested positive for opioids and marijuana while still hospitalized following Serenity's birth. Petitioner/Appellee the Department of Children's Services ("DCS") was called.[2] Mother claimed to the DCS investigator that she

---

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

[2] We take these facts from the later filed dependency and neglect petition, as Mother stipulated that the children were dependent and neglected "as outlined in the [] petition."

and her baby had been drugged by the hospital. When asked how many children Mother had in total, she responded that she had three—Jaidon, Zuri, and Serenity. When asked about Aviannah, Mother testified that she had a prior DCS case involving Aviannah, in which she was found to be a "substantiated perpetrator."

While in the hospital, Serenity was treated for symptoms associated with in utero drug exposure. Mother also began exhibiting homicidal and suicidal ideations. Mother admitted that she was homeless and living in a motel, and that she had no supplies for Serenity. Due to Mother's continuous threatening behaviors, she was transferred to Middle Tennessee Mental Institute but was released the same day when the evaluation deemed Mother no danger to herself or others.

Nevertheless, DCS removed the children and placed them in foster care. Eventually a protective custody order was entered by the Montgomery County Juvenile Court ('the trial court") on September 10, 2018, placing the children in DCS custody. DCS filed a petiton to adjudicate the children as dependent and neglected on September 10, 2018, detailing how it came to be involved with these children. Mother first signed the Criteria and Procedures for Termination of Parental Rights on December 4, 2018. Multiple permanency plans were created by DCS, which generally focused on Mother's drug use, housing, and mental health. In particular, Mother was generally required to participate in drug and/or mental health treatment and either provide proof to DCS of completion or sign releases to allow DCS to obtain information concerning completion, obtain stable housing and provide proof to DCS, and participate in random drug screens as requested by DCS. Eventually, on March 19, 2019, the trial court entered an order adjudicating the children dependent and neglected based on Mother's waiver and stipulation as to the facts in DCS's petition. According to DCS, Mother never made progress on the issues that led to the removal such that the children could be returned to her.

Therefore, on February 10, 2020, DCS filed a petition to terminate Mother's parental rights on grounds of severe abuse, abandonment, persistent conditions, and failure to manifest a willingness and ability to assume custody or financial responsibility.[3] Mother was initially appointed counsel by order of June 23, 2020. As discussed in detail, *infra*, in September 2019, Mother's visitation was suspended. On January 25, 2021, Mother, represented by new counsel, filed a motion to reinstate visitation, which was never ruled on.

Trial on the termination petition occurred on June 21, 2021. The bulk of DCS's proof came from Jamin Pena, a team leader with DCS. Ms. Pena testified that the main concerns in this case for DCS following the removal were Mother's housing, her drug use, her mental health, and the effect of her visitation on the children. According to Ms. Pena,

---

[3] The petition also asked that the parental rights of the children's fathers be terminated. The trial court eventually terminated their rights with no participation by the fathers. They have not appealed.

none of these issues had been successfully ameliorated such that DCS could return the children to Mother. In contrast, Mother and maternal grandmother testified that Mother was now ready and capable of caring for the children.

The proof showed that Mother was initially allowed visitation with the children. It appears, however, that Mother's visitation was suspended on two occasions. First, on April 12, 2019, the trial court entered an order suspending Mother's visitation until she produced a clean drug screen and proof of stable housing. Visitation may have resumed in some fashion,[4] however, because on August 29, 2019, the children's guardian ad litem filed a motion to suspend therapeutic visitation and family therapy. Therein, the guardian ad litem alleged that Mother was "causing the children more harm than good and the children are regressing." Specifically, the guardian ad litem asserted that the trial court has ordered that the children would participate in therapeutic visitation with Mother. Only two such visitations actually occurred, however, and appeared to involve only the older two children. Thereafter, the supervisor of the visits recommended that the visits be terminated because Mother was a "mental trigger" for the children due to her inconsistent behavior. In particular, the supervisor alleged that the children exhibit negative behaviors following visitation with Mother that take more than a week to correct.

An order was apparently entered in late September 2019 that suspended even therapeutic visitation.[5] As such, no visitation of any kind occurred between Mother and the children from that date. But the testimony of Ms. Pena was that Mother was made aware that she could petition the trial court to reinstate visitation. Mother filed no such petition until after the termination petition was filed. Moreover, Ms. Pena testified that once contact with the children was suspended, Mother never called DCS to inquire about the children's well-being. Instead, in November 2019, Mother called the police to the children's foster home for a welfare check.

Testimony at trial also focused on Mother's housing. At the time of the removal, Mother had been evicted from her home and was living in a hotel with the children. Due to Mother's hospitalization, the children were staying with relatives. Eventually, Mother did obtain an apartment in Kentucky and provided DCS with a copy of lease. DCS requested that Kentucky authorities conduct a home study under the Interstate Compact on the Placement of Children in October 2019. On May 21, 2020, however, the Kentucky case was closed due to noncompliance. According to Ms. Pena, Mother's roommate and/or boyfriend refused to participate in necessary background checks and fingerprinting, so the home study could not be completed. Mother testified, however, that she requested that another home study be completed after her roommate/boyfriend moved out. Ms. Pena was

---

[4] According to the guardian ad litem, therapeutic visitation was ordered by the trial court on July 22, 2019.

[5] This order is not contained in the record, but it is mentioned by the trial court during trial and does not appear to be in dispute.

asked by Mother's counsel if he had requested a second home study; she agreed that he had within the last year, but testified that DCS had not requested that Kentucky conduct one. Thus, by the time of trial, no home study had been conducted on Mother's home in Kentucky.

Mother's mental health was also a central issue at trial. Following Mother's mental health episode relative to the birth of Serenity, Mother underwent a mental health assessment that recommended Mother participate in counseling. Mother was eventually discharged from this counseling in September 2020, due to too many missed appointments. Mother claimed that her missed appointments resulted from a car accident and/or a change in providers. Mother also testified that she was receiving treatment from another provider, Health Connect. Ms. Pena testified that DCS did receive documentation in March 2021 that Mother was supposed to begin receiving treatment at Health Connect. But after that initial contact DCS received no "confirmation that [Mother] [wa]s involved in any type of mental health services" and no confirmation that Mother was actively seeking treatment. Mother likewise provided no proof beyond her own testimony at trial that she was consistently attending mental health treatment.

The testimony also focused on Mother's drug use. Mother admitted at trial that she had previously used THC,[6] even during pregnancy, but denied ever using opioids. Still, Mother participated in an alcohol and drug assessment as requested by DCS. She was also required by the permanency plans to submit to random drug screens when requested by DCS. In May 2019, Mother successfully completed an intensive outpatient program for substance abuse. One month later, however, Mother relapsed on THC. As a result, she was directed to take another alcohol and drug assessment. Mother never did so.

Mother's participation in random drug screens was also spotty. The record contains twenty-seven drug screen consent and results forms. Five of the tests Mother tested positive for an illegal, unprescribed substance, the latest being on March 9, 2020; seventeen times Mother failed to show for the test or otherwise provided some excuse for why she could not participate in the test; five times Mother tested negative for all illegal substances, the latest being on July 3, 2019. Mother claimed, however, that when she failed to show up for the tests it was because DCS contacted her for testing "at inopportune times." Instead, Mother testified that she had presented herself to DCS on multiple occasions for drug screens; Ms. Pena confirmed that Mother had done so, but testified that they could not test Mother on those occasions because the tests would not have been random, as required by the permanency plans.

---

[6] "THC is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

In an effort to evaluate Mother's sobriety in a more flexible way due to Mother's alleged scheduling conflicts, Ms. Pena testified that DCS requested a hair follicle drug screen beginning in March 2021.[7] DCS submitted a referral to pay for the test and informed Mother that she would need to complete the test by June 17, 2021; according to Ms. Pena, however, she explained that Mother would need to schedule the test in advance of that date. Mother waited until that day around closing time to appear for the testing, but was informed that it was too late to be tested. As a result, the testing center was not able to schedule the test until the Tuesday after trial and no hair follicle drug screen could be completed by the time of trial.

At the time of trial, the three youngest children were in foster homes, while Jaidon had recently been placed in a residential facility while an investigation into certain allegations against him was ongoing.[8] Although not entirely clear, it appears that the three younger children may have been placed in the same foster home.[9] There was also no testimony at trial as to whether their placements are pre-adoptive, but again, some documents submitted at trial indicate that the home is pre-adoptive.[10] According to Ms. Pena and Vicki Green, the children's caseworker, the children have overall done better since visitation with Mother was suspended. Ms. Pena testified that Zuri came into DCS custody suffering from some mental health issues and trauma. She receives therapy once a week. Although she is doing well in her foster home, she still has issues with stealing and not telling the truth. Aviannah has been diagnosed with autism, suffers from some delays, and receives services at school four to five times per week. According to Ms. Green, since the removal, Aviannah has become calmer and more laid back. The same is true of Serenity, who is doing well and is on track developmentally.

At the conclusion of trial, the trial court orally ruled in favor of DCS. The trial court entered a written order on June 29, 2021, finding that DCS had proven the following

---

[7] Describing this type of testing as a "hair follicle" screen is "a common misnomer." Nicole Jupe, Common Questions About Hair Testing, Quest Diagnostics Employer Solutions Blog (updated March 9, 2021), https://blog.employersolutions.com/common-questions-about-hair-testing/. As a testing company explains:

> The hair follicle is actually the pocket, below the scalp, from which the hair strand grows. During a hair drug test collection, the hair is cut as close to the scalp as possible, so only the strands of hair above the scalp is tested and not the actual hair follicle. True hair follicle testing requires the hair to be "plucked" rather than cut which can lead to extreme donor discomfort.

*Id.*

[8] The testimony concerning the allegations was vague and need not be reproduced here.

[9] For example, there is a March 2020 motion in the dependency and neglect file indicating that the children wish to travel to Disney World with their foster parents, but that Mother was withholding her consent.

[10] Specifically, in a February 1, 2021 permanency hearing order, the trial court found that the children were "placed in a in a pre-adoptive Natchez Trace provider home."

grounds: abandonment, persistent conditions, and failure to manifest a willingness and ability to assume custody or financial responsibility. The trial court also ruled that termination was in the children's best interest. Mother thereafter appealed to this Court.[11]

## II. ISSUES PRESENTED

As we perceive it, this appeal involves two issues:

1. Whether the trial court erred in finding clear and convincing evidence of grounds to terminate Mother's parental rights?
2. Whether the trial court erred in finding clear and convincing evidence that termination was in the children's best interests?

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citations and quotations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-

---

[11] Mother is not represented by the same counsel in this appeal as she was in the trial court.

finder's mind a firm conviction as to the truth." ***In re S.R.C.***, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W.3d at 523–24 (citations omitted). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." ***Id.*** at 524 (citation omitted).

## IV.  ANALYSIS

### A.  Grounds for Termination

Although Mother designated the grounds for termination as issues in this appeal, she does not address grounds in the argument section of her brief. Indeed, in her brief, Mother concedes that the grounds for termination are "not seriously questioned." We will nevertheless briefly address each of the grounds for termination found by the trial court. *See **In re Carrington H.***, 483 S.W.3d at 525–26 (holding that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal"). The grounds at issue in this appeal are therefore: (1) abandonment by failure to pay support; (2) persistence of conditions; and (3) failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility for the children.

### 1.  Abandonment by Failure to Pay Support

We begin with abandonment for failure to pay support. For the purpose of this case, abandonment can occur when a parent or guardian failed to visit or support a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A lack of willfulness can serve as an affirmative defense to the ground of failure to visit or support. Tenn. Code Ann. § 36-1-102(1)(I). However, a parent "shall bear the burden of proof that the failure to visit or support was not willful" and must establish the lack of willfulness by a preponderance of evidence. ***Id.***

The proof showed in this case that Mother did not pay support in the four months preceding the filing of the termination petition. She also filed no pleading raising the affirmative defense of lack of willfulness and does not argue that this issue was tried by consent. *See, e.g., **In re Christopher L.***, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *5 (Tenn. Ct. App. Sept. 13, 2021) (holding that the parent waived the defense of willfulness by not raising it in an answer, but that the issue was tried by consent); ***In re***

*Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at \*4 (Tenn. Ct. App. May 28, 2021) ("Father failed to plead the absence of willfulness in either of his responses to the petition to terminate parental rights. So he waived the absence of willfulness as a defense to the ground of abandonment by failure to support."). As such, the trial court did not err in finding clear and convincing evidence to support this ground for termination.

### 2. Persistence of Conditions

DCS also relies on persistence of conditions, pursuant to Tennessee Code Annotated section 36-1-113(g)(3):

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

   (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
   (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
   (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

There is no dispute in this case that the children were removed from Mother's custody for a period of six months by an order entered in a dependency and neglect action. Thus, the dispositive questions are whether conditions persist that prevent the safe return of the children, whether the conditions will likely be remedied at an early date, and whether the continued relationship prevents early integration of the children into a stable, permanent home. As we have previously explained,

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct.

App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016).

Here, Mother stipulated to the allegations in the dependency and neglect petition regarding a lack of housing, mental health concerns, and drug use while pregnant. DCS presented proof in an effort to show that Mother had not adequately remedied any of these conditions. Specifically, DCS witnesses testified that Mother was not compliant with mental health counseling, refused to appear for random drug screens, delayed obtaining a hair follicle drug screen, and had not completed the home study ordered by DCS when she moved to Kentucky. In her brief, Mother appears to concede that she failed to remedy the conditions that led to the removal.[12] And our own review confirms that the trial court had ample evidence to terminate Mother's rights on this ground.

Here, the evidence shows that Mother failed to participate in random drug screens on a consistent basis. Indeed, the most recent drug screen contained in the record that Mother actually took was positive for an illegal substance.[13] Mother continued to use drugs even after completing an intensive outpatient drug treatment program in 2019 and never took another alcohol and drug assessment, even though she was directed to do so following her relapse. And while Mother claimed her schedule prevented her from participating in random drug screens, Ms. Pena testified that had Mother given her a work schedule as she requested, DCS would have been able to work around it to do drug screens. Moreover,

---

[12] Mother blames DCS for what she herself characterizes as her "failure" to remedy persistent conditions. "[T]he termination statute regarding persistence of the conditions leading to the [c]hildren's removal also contains no requirement that DCS expend reasonable efforts to assist a parent in remedying such conditions." *In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at *22 (Tenn. Ct. App. Nov. 28, 2018) (citing Tenn. Code Ann. § 36-1-113(g)(3)).

[13] This drug screen was conducted on March 9, 2020. The testimony at trial was that Mother took another drug test on June 12, 2020. However, the record does not contain results from this drug screen, nor was there any testimony as to its results.

even without a work schedule from Mother, DCS did attempt to work around Mother's failure to appear for random drug screens by requesting that Mother take a hair follicle drug screen. Although the testimony of Ms. Pena was that they requested this test in March 2021, Mother waited until the days immediately before trial to even attempt to schedule the test, at which time it was too late. As a result, the record contains no drug screen on Mother for at least a year prior to trial. While Mother's claims of scheduling conflicts and misunderstandings may be true to some extent, it is simply not reasonable that Mother was unable to timely appear for even a single random drug screening in over a year. And her desultory attempt to finally obtain a hair follicle test in the days before the scheduled termination trial court were "too little, too late" to be counted as positive effort toward reunification. *See, e.g.,* ***In re Austin D.***, No. E2012-00579-COA-R3PT, 2013 WL 357605, at \*13 (Tenn. Ct. App. Jan. 30, 2013) (noting that efforts to finally take required anger management classes two years after first ordered to so do were "too little, too late" for purposes of the ground of persistence of conditions). Simply put, with the permanent cessation of her relationship with her children close on the horizon, more was required of Mother to meet DCS's requests regarding drug testing.

Housing was also still an issue at trial. Mother did not dispute that the Kentucky home study denied placement of the children in Mother's home because her roommate or boyfriend refused to participate in a background check. Mother claimed, however, that he no longer lived with her and that she requested a second home study be performed. Indeed, the DCS worker admitted that Mother's counsel had made that request but agreed that the request was made "early in this year," i.e., 2021. So it appears that this request was made around one year after the termination petition was filed.[14] Again, this belated effort to finally obtain a successful home study was "too little, too late." ***In re Austin D.***, 2013 WL 357605, at \*13. And as a result, no successful home study was able to be completed in this case and DCS testified that they could not return the children to the home in its absence.

Mother's mental health was also an outstanding issue. Here, the DCS worker testified that although Mother was participating in mental health treatment, she was discharged in September 2020 due to missed appointments. Mother testified, however, that she was still seeking treatment elsewhere and that she was prevented from seeking treatment at the program DCS set up for various reasons. It does appear that Mother may have sought out additional mental health treatment in March 2021, approximately seventeen months after she was discharged from her first provider, over a year after the termination petition was filed, and only a few months prior to the termination trial. But thereafter DCS received no confirmation that Mother had even actually begun that treatment. As such, Ms. Pena testified that DCS continued to have concerns that Mother's mental health issues were not fully addressed. Based on this testimony, the trial court

---

[14] Mother was initially appointed different counsel. No order is included in the record appointing the attorney who represented her during trial. The first pleading filed by this attorney was on January 25, 2021.

found that Mother "continues to have unaddressed mental health issues." Thus, the trial court appeared to discredit Mother's claim that she was consistently and actively seeking mental health treatment. Nothing in the record or Mother's appellate brief leads us to overturn that implicit credibility finding. *See In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990) (noting that when "an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings")). So we conclude that DCS showed by clear and convincing evidence that Mother was not sufficiently addressing her mental health, drug, or housing issues. And given the length of time that the children have been removed and Mother's failure to provide DCS with any proof of improvements as to these concerns, it appears unlikely that Mother will make any such improvements in the near future. *See In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *14 (Tenn. Ct. App. July 6, 2021) (considering a period of only fourteen months to conclude that the parent would not remedy the conditions at an early date).

Finally, even though the proof as to whether the younger children's foster home is pre-adoptive was not entirely clear, DCS presented sufficient proof that continued involvement with Mother will prevent the children from early integration into a safe, stable home. *See, e.g., In re L.F.*, No. M2020-01663-COA-R3-PT, 2021 WL 3782130, at *9 (Tenn. Ct. App. Aug. 26, 2021) ("[P]lacement of the children in a pre -adoptive foster home is not required to find [] the final element of persistence of conditions[.]"); *In re James W.*, 2021 WL 2800523, at *14 ("Previously, this court has repeatedly affirmed "persistence of conditions" as a ground for termination despite a child not being placed in a pre-adoptive home."). Here, Mother was given nearly three years to remedy the conditions that led to the removal without making sufficient progress that even unsupervised visitation was an option; the children have been left in limbo for this time.[15] According to the letter from the visitation supervisor, involvement with Mother caused the children to exhibit negative behaviors that took a week or more to correct. Although the children still face challenges, the proof was undisputed that after the suspension of Mother's contact with the children, they improved. Moreover, the two older children have expressed that they do not want to see Mother, much less return to her custody. Thus, this ground for termination is affirmed.

### 3. Willingness and Ability

---

[15] It also does not appear that this is Mother's first involvement with DCS, given her statement that she was a "substantiated perpetrator" as to one of the children prior to this case. *See In re James W.*, WL 2800523, at *14 (considering both the length of time between the removal and the termination trial and the fact that DCS had been involved with the children on prior occasions).

DCS next contends that Mother failed to manifest a willingness and ability, whether by act or omission, to personally assume legal and physical custody or financial responsibility of the children and that placing the children in her legal and physical custody would create a risk of substantial harm to the children's physical or psychological welfare. Tenn. Code Ann. § 36-1-113(g)(14). Essentially, the statutory ground has two distinct elements which must be proven by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].' DCS must then prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)). As for the first element, the petitioner must "prove[ ] by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> [an] ability or willingness" to parent the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).

In this case, as previously discussed, the evidence clearly shows that Mother is unable to take physical custody of the children. Here, when DCS first attempted a home study, Mother's boyfriend or roommate refused to comply, resulting in termination of the home study. Although Mother now claims that he moved out, the proof indicates that she did not seek another home study until well after the termination petition was filed. *See In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *7 (Tenn. Ct. App. Feb. 8, 2019) (citing *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)) (noting that a parent's ability is generally measured as of the time the petition is filed). Mother has also failed to provide any proof beyond her unsupported promises that she is participating in mental health treatment or free from illegal drug use. These issues mean that Mother is presently unable to take physical custody of her children.

We therefore proceed to consider whether DCS presented clear and convincing evidence sufficient to satisfy the second prong of the statute—that placing the children in Mother's legal and physical custody would create a risk of substantial harm to their physical or psychological welfare. Tenn. Code Ann. 36-1-113(g)(14). With regard to substantial harm, this Court stated that:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it

- 12 -

indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *7 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)).

We have little difficulty finding a substantial risk of harm to Mother's youngest child, Serenity. Here, the child was removed from Mother's custody at birth. Although Mother appears to have had some visitation with Serenity, there is no dispute that all visitation and phone calls were terminated for nearly two years by the time of trial.[16] Thus, Mother essentially had no visitation or contact with the child for over half her life and the visitation that did occur, if any, was when Serenity was very young. Under these circumstances, it appears that Mother can be little more than a stranger to this child. And we have previously held that placing the child with a stranger creates a substantial risk of harm. *See, e.g., In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020), appeal denied (Dec. 10, 2020) ("[F]orcing the child to begin visitation with a near-stranger would make psychological harm sufficiently probable"); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (holding that substantial harm could be established when a child was removed from a home when very young and had nightmares out of fear of being removed from his foster family); *State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (holding that removal from the child's current family and placement with a near-stranger could constitute substantial harm).

Although the risk of substantial harm is a closer question as to Mother's older children, we conclude that DCS met its burden as to them as well. Here, Mother stipulated that the children were removed from her custody due to housing, drug, and mental health issues. In particular, Mother's mental health issues were that she was suffering from suicidal and homicidal ideations at the birth of her youngest child. As such, her mental health treatment was a central component of her ability to resume custody with the children. But the mental health treatment that DCS set up for Mother was terminated in September 2020 due to Mother's noncompliance. And although Mother claimed to be seeking treatment elsewhere, she wholly failed to provide DCS with any proof to support that claim. Even at trial, Mother had no proof beyond her unsupported testimony that she was consistently engaged in mental health treatment, which the trial court clearly did not believe. The issues that Mother experienced at the birth of Serenity clearly indicate that the children were at risk of substantial harm if left in her custody. And despite the passage of nearly three years, DCS presented proof that Mother failed to demonstrate that she was

---

[16]. Specifically, Mother testified that she has "not seen or talked to my children since September 2019." Thus, by the time of trial, nearly one year and nine months had passed since any contact had occurred.

consistently seeking treatment such that DCS could have concluded that her mental health concerns were being taken seriously. And, as previously discussed, Mother's housing and sobriety were also still in question at the time of trial. Under these circumstances, we cannot conclude that the trial court erred in finding clear and convincing evidence that the children were likely to suffer substantial harm if returned to her custody.

## B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607.

The statutory factors that courts should consider in ascertaining the best interest of the children include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance

analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[17] "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted). In this case, the trial court found that every factor listed above favored termination, with the exception of factor (5), which DCS does not dispute. We will therefore consider each of the remaining factors.

With regard to factors (1) and (2), Mother essentially admits that she did not demonstrate a lasting adjustment of circumstances, but argues that her failure to do so was the result of DCS's failure to make reasonable efforts toward reunification and its choice to instead place barriers against reunification. Specifically, Mother asserts in her brief that she "is willing to work with DCS to get her children returned to [her] custody." Respectfully, the time for working with DCS has long past. Here, DCS required nothing more than that Mother make reasonable efforts to show her ability to parent, including by, inter alia, submitting to random drug screens, by complying with a home study, and by visiting with her children without causing them distress. Despite the fact that DCS offered support to Mother in completing these tasks, Mother refused to comply at nearly every turn. Mother did not participate in random drug screens in the year before the termination trial, always offering some excuse for her failure. But she also failed to make any effort to obtain the hair follicle test DCS requested until it was too late. The home study could not be completed because the person she chose to live with refused to participate. Mother thereafter waited until well after the termination petition was filed to request another home study. And her visitation with the children was terminated based on allegations that she was a "trigger" for negative behaviors for the child. Thus, it appears that it was not DCS's lack of effort, but Mother's own delay and feeble attempts to demonstrate a lasting change that resulted in her inability to regain custody in this case. As such, we conclude that these factors strongly favor termination.

---

[17] This is the version of section 36-1-113(i) that was in effect when the termination petition was filed. The Tennessee General Assembly amended the statutory best interest factors in 2021. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. Neither party asserts that the revised version of the statute is applicable in this case.

As to factors (3) and (4), the proof shows that Mother had not had visitation with the children for nearly two years at the time of trial. Although the lack of visitation was the result of a court order, Mother did not dispute that she would have been entitled to visitation had she passed drugs screens and provided proof of stable housing or sought modification of the suspension order in the trial court. After the suspension of visitation, however, Mother continued to fail some drug screens, refused to participate in other screens, and failed to timely obtain a hair follicle test. Moreover, the home study could not be completed and she failed to seek a second home study or obtain modification of the order suspending visitation until after the termination petition was filed. While Mother professed her love for the children at trial, as a result of the suspension of visitation due to Mother's own conduct, she had no meaningful relationship with any of her children by the time of trial. The trial court's findings as to these factors must therefore be affirmed.

The trial court also found that factor (6), regarding abuse and neglect, favored termination. Here, the proof shows that Mother used illegal drugs while pregnant with Serenity and that she received treatment for a disorder associated with neonatal drug use.[18] We have previously held that drug use in utero weighs in favor of termination under this factor. *See, e.g., **In re Mynajah S.**,* No. E2021-00040-COA-R3-PT, 2021 WL 3520856, at *18 (Tenn. Ct. App. Aug. 11, 2021). Likewise, as to factor (7), the evidence does not preponderate against the trial court's finding that Mother was unable to demonstrate that her home is safe and free from drugs, as discussed *supra*. The same is true of Mother's apparent failure to consistently attend mental health treatment as to factor (8). Finally, with regard to factor (9), the proof shows that Mother did not pay child support consistently until after the termination petition was filed. Her only excuse for her failure to do so was that she was not aware that an order had been entered. It is well-settled that this is no excuse. *See **In re Gabriel B.**,* No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *7 (Tenn. Ct. App. July 23, 2018) (citing Tenn. Code Ann. § 36-1-102(1)(H)) ("The legislature presumes a parent who is at least eighteen years old is aware of his or her legal obligation to support his or her child, even if there is no court order requiring the parent do so.").

So the trial court found that eight out of nine best interest factors weighed in favor of termination. But we do not determine the best interest of a child merely by totaling the number of factors that weigh for or against termination; instead, that determination often depends on the relevancy and weight of each factor. *See **In re I.E.A.**,* 511 S.W.3d 507, 518

---

[18] Specifically, the dependency and neglect petition stated that Serenity was having symptoms consistent with "NAS." "NAS" is an acronym for neonatal abstinence syndrome, which "is caused when a baby withdraws from drugs, usually opioids, to which the baby has been exposed in utero." ***Effler v. Purdue Pharma L.P.***, 614 S.W.3d 681, 687 n.5 (Tenn. 2020) (citing *Neonatal Abstinence Syndrome (NAS)*, March of Dimes, https://www.marchofdimes.org/complications/neonatal-abstinence-syndrome-(nas).aspx (last visited Dec. 15, 2020)).

(Tenn. Ct. App. 2016) (quoting *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Here, the record shows that Mother has had no involvement with these children in nearly two years. And she has made only half-hearted and eleventh hour attempts to complete the requirements that would have allowed her to resume her role in their lives. Although some of the children have experienced challenges and set-backs following the removal, the testimony at trial was that, on balance, the children are doing better now than they were in Mother's custody. DCS also expressed very valid concerns that Mother has simply not demonstrated an ability to parent the children to the extent that they require either now or in the near future. As a result, we conclude that termination is in the children's best interests.

## V. CONCLUSION

The judgement of the Montgomery County Juvenile Court is affirmed, and this cause is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant, Charity S., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE